**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.    03-cr-087 (JDB)** |
| | ) | |
| **KEITH LAMONT FOGLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EMERGENCY MOTION FOR INDICATIVE RULING ON REQUEST FOR**
**COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)**

 Mr. Keith Fogle, through counsel, respectfully moves this Court, for an indicative ruling that the Court would grant Mr. Fogle's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) to allow for his immediate release from imprisonment by reducing his sentence to time-served underlined concurrent to his sentence in D.C. Superior Court Case No. 2012-CF1-20391, or, in the alternative, to a term of no more than 93 months.  *See* Fed. R. Crim. P. 37(a); Fed. R. App. P. 12.1(a).

 Mr. Fogle is nearly 49 years old; suffers from a myriad of serious health issues, including diabetes, hypertension, hyperlipidemia, and obesity; and has served over 16 years (approximately 193 months), not including any good time credit, for selling less than one gram of crack cocaine to undercover police officers on one occasion.  Although Mr. Fogle's criminal history was so relatively minor that he had never been sentenced to serve more than three days of imprisonment for any prior conviction, he was sentenced as a "career offender" to 280 months of imprisonment (over 23 years) for the one-time, non-violent, street-level drug offense in this case.  Under today's law, the Guidelines would prescribe merely 21 to 27 months of imprisonment for a similarly-situated defendant.  The Court sentenced Mr. Fogle less than five months after the

1

Supreme Court vitiated the mandatory character of the U.S. Sentencing Guidelines in *United States v. Booker*, 543 U.S. 220 (2005), when courts had not yet embraced the full scope of their sentencing discretion under 18 U.S.C. § 3553(a). Mr. Fogle's sentence is far greater than necessary, and this Court now may reduce it.

In light of the many mitigating factors in this case—including the non-violent nature and momentary duration of the offense, and Mr. Fogle's rehabilitation and conduct in prison, as well as the catastrophic consequences for Mr. Fogle should he contract COVID-19, a sentence reduction allowing for his immediate release from imprisonment is warranted. Accordingly, and for the reasons discussed below, this Court should "state . . . that it would grant" Mr. Fogle's motion for compassionate release to allow for his immediate release from imprisonment "if the court of appeals remands for that purpose." Fed. R. Crim. P. 37(a)(3).

## BACKGROUND

### I.    Conviction and Sentencing

In May 2003, Mr. Fogle was charged by indictment with three counts of unlawful distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), for selling a total of 0.82 grams of crack in three $20 transactions to undercover police officers "within a span of 15 minutes" one month earlier, on April 1, 2003. Indictment (May 1, 2003), ECF No. 1; Presentence Investigation Report ("PSR") ¶¶ 1, 4-8, 22.

On September 30, 2004, the government filed a Notice of Enhanced Penalties, under 21 U.S.C. § 851(a), on the basis of a 1991 conviction for attempted possession with intent to distribute ("PWID") cocaine, in D.C. Superior Court Case No. F12534-90. Notice of Enhanced Penalties ("Gov't Notice") at 1-2, ECF No. 11. This conviction stemmed from offense conduct as a teenager, and Mr. Fogle was sentenced under the Youth Rehabilitation Act ("YRA") to a

2

two-year term of probation.  PSR ¶ 31.  Mr. Fogle successfully completed probation, and the conviction was then set aside.  *Id.*

In March 2005, Mr. Fogle was found guilty by a jury on all three counts of the indictment.  PSR ¶ 3.  The Probation Office prepared a PSR prior to sentencing using the 2004 Guidelines Manual.  *See* PSR ¶ 18.  According to the PSR, Mr. Fogle's base offense level was 16 under U.S.S.G. § 2D1.1(a)(3) and (c)(12), based on the "net weight of .82 grams of cocaine base" involved in the three drug transactions.  *Id.* ¶ 22.  The PSR then applied a two-level increase for obstruction of justice, under U.S.S.G. § 3C1.1, based on Mr. Fogle's testimony in his own defense at trial.  *Id.* ¶ 25.  The 2-level increase ultimately made no difference, however, because the PSR found Mr. Fogle to be "a career criminal" under U.S.S.G. § 4B1.1(a).  *Id.* ¶ 27.  Consequently, Mr. Fogle's offense level doubled to 34.  *Id.* ¶¶ 27, 29.  The PSR calculated Mr. Fogle's criminal history category at Category III, but because of the career offender determination, it became the highest possible category, Category VI.  PSR ¶¶ 35-37.  As a result, the Guidelines prescribed a range of 262 to 327 months (over 21 to 27 years) of imprisonment.  *Id.* ¶ 71.

Mr. Fogle's draconian career offender sentence was based on his prior convictions for Maryland burglary (for which he served a 3-day sentence) and D.C. attempted robbery (for which he served no term of imprisonment).[1]  These convictions were, at the time of his sentencing, considered "crimes of violence" under the residual clause of the career offender

---

[1]  The government <u>incorrectly</u> asserted in a brief that the conviction was for "attempt <u>armed</u> robbery."  Mem. Op. (Sept. 30, 2019) at 1 n. 2, ECF No. 111 (quoting United States' Opp'n to Def.'s Mot. to Reduce Sentence pursuant to the First Step Act of 2018 at 4, ECF No. 104).  The offense was <u>not</u> armed.  *See* Ex. A, Plea and Judgment, D.C. Sup. Ct. No. F-6119-99.

Guideline.  Since then, the Supreme Court effectively nullified the residual clause and the Sentencing Commission removed it from the Guidelines.

Without the career offender designation, at the time of sentencing, Mr. Fogle's total offense level would have been 18 and his criminal history score of 5 would have placed him in Category III.  PSR ¶¶ 26, 35-36.  Accordingly, the Guidelines would have prescribed a range of only 33 to 41 months.  Today, the Guidelines range for a similarly situated defendant would be even lower.  The drug quantity of 0.82 grams of cocaine base now yields a base offense level of only 12.  *See* U.S.S.G. § 2D1.1(a)(5), (c)(14) (2018).  The total offense level with the two-level increase for obstruction of justice would thus be 14.  And in criminal history category III, the Guidelines would prescribe a range of only 21 to 27 months (approximately two years) of imprisonment.  The Guidelines range today would be a tenth of what it was when Mr. Fogle was sentenced in 2005.

In June 2005, Mr. Fogle was sentenced to 280 months (over 23 years) of imprisonment on each of the three counts to run concurrently, with concurrent six-year terms of supervised release to follow.  Judgment (June 1, 2005), ECF No. 40.  He is imprisoned at FCI Loretto, and his projected release date is April 6, 2035.

## II.    Subsequent D.C. Superior Court Proceedings

At the time of sentencing in the instant case, felony murder charges were pending against Mr. Fogle in D.C. Superior Court Case No. F01430-05.  *See* PSR ¶¶ 49-51.  In February 2008, Mr. Fogle was found not guilty by a jury on the felony murder charge and the government dismissed all remaining related charges.

In November 2014, on the eve of trial and faced with the possibility—because of the draconian sentence he was serving in this federal case—of serving his entire life in prison, Mr.

Fogle pled guilty to one count of voluntary manslaughter in D.C. Superior Court case 2012-CF1-20391. Pursuant to the plea agreement, he was sentenced to 10 to 30 years' imprisonment, all suspended but for 10 years, and five years' supervised release, to run consecutively to the instant federal sentence.

Today, even if this Superior Court conviction gave Mr. Fogle three additional criminal history points and put him in Criminal History Category IV of the federal sentencing guidelines, his Guidelines range in the instant case would be only 27 to 33 months of imprisonment.

## III.    Collateral Proceedings

Mr. Fogle requested collateral relief under 28 U.S.C. §§ 2241 and 2255 from his career offender sentence in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015). After a hearing, the Court denied relief on timeliness grounds and denied Mr. Fogle's request for a certificate of appealability. Mem. Op. (Sept. 30, 2019), ECF No. 111; Order (Oct. 28, 2019), ECF No. 117. The D.C. Circuit similarly denied his motion for a certificate of appealability. Order (D.C. Cir. Apr. 9, 2020).

Mr. Fogle separately requested a reduced sentence under § 404(b) of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018). The Court denied Mr. Fogle's motion, finding he was ineligible for relief because "[t]he Fair Sentencing Act did not modify the statutory penalties for . . . a violation" of 21 U.S.C. § 841(b)(1)(C). Order (Sept. 24, 2019) at 1-2, ECF No. 107 ("Order Denying FSA Mot."). Mr. Fogle appealed, and the appeal is pending in the D.C. Circuit in *United States v. Fogle*, No. 19-3072.[2] There is currently a circuit split on the

_____

[2] On August 17, 2020, Mr. Fogle filed an unopposed motion to hold the appeal in abeyance pending the outcome of the instant motion because this Court's grant of an indicative ruling on compassionate release may obviate the need to proceed with the appeal. The court has not yet ruled on that motion.

issue.  *Compare United States v. Woodson*, No. 19-6976, 2020 WL 3443925 (4th Cir. June 24, 2020), and *United States v. Smith*, 954 F.3d 446 (1st Cir. 2020), *with United States v. Birt*, No. 19-3820, 2020 WL 4045895 (3d Cir. July 20, 2020), and *United States v. Foley*, 798 F. App'x 534 (11th Cir. 2020).

## IV.   The COVID-19 Pandemic and Outbreak at FCI Loretto.

The Covid-19 pandemic is a global health crisis unprecedented in modern times.  As of August 16, approximately 21.2 million people had been infected with Covid-19, and more than 761,000 people had died from the illness throughout the world.   World Health Organization ("WHO"), *Coronavirus Disease (COVID-19) Weekly Epidemiological Update 1* (Aug. 17, 2020).  The United States leads the world in reported Covid-19 cases, with over 5.2 million infected, and over 167,000 deaths.  *Id.*; *cf.* Ex. B, W. Joost Wiersinga et al., *Pathophysiology, Transmission, Diagnosis, and Treatment of Coronavirus Disease 2019 (COVID-19)* at E9, JAMA Online (July 10, 2020) ("JAMA Article") ("Because not all people who die during the pandemic are tested for COVID-19, actual numbers of deaths from COVID-19 are higher than reported numbers.").

Incarcerated people "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[3]  As courts have recognized, there can be no doubt that "the COVID-19 virus spreads with uncommon and frightening speed in carceral settings." *United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).

> Jails and prison[s] are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment.

---

[3] *Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* at 2 (Mar. 2, 2020), https://perma.cc/KGP7-PDVJ.

*Id.*; *see also United States v. Scparta*, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("The risk to incarcerated individuals . . . is acute; as this Court has explained, individuals in carceral settings are at particularly high risk for contracting the disease because of the inability of individuals to socially distance, shared communal spaces, and limited access to hygiene products.").  "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Jul. 22, 2020).  Even with efforts to limit movement in facilities, inmates must still reside in heavily-trafficked communal living spaces, touch shared equipment, such as telephones and computers, and interact with prison staff who enter and exit the facility each day.[4]

Consequently, the situation in the Bureau of Prisons ("BOP") is dire.  As of August 19, the BOP reported over 12,881 inmate and staff "confirmed positive test results for COVID-19 nationwide."  BOP, *COVID-19 Resource Page*, www.bop.gov/coronavirus/ (accessed Aug. 19, 2020) ("BOP COVID-19 Page").  At least 114 inmates and one staff member have died.  *Id.*[5] The reported federal inmate infection rate is approximately 6 times higher than that in the United

---

[4] It cannot seriously be disputed that a person's risk of exposure to COVID-19 is significantly greater in prison than it is outside of prison.  Any claim that BOP facilities generally, or FCI Loretto in particular, are as safe or safer than the community-at-large is simply unsupportable.

[5] However, BOP has kept many inmate deaths and at least one staff member death "off the books."  *See, e.g.*, Joseph Neff & Dane Kane, *Freed From Prison, Dead From COVID-19, Not Even Counted*, The Marshall Project (July 10, 2020); *Lompoc Prison Inmate Dies Amid Worsening Coronavirus Outbreak*, Cal Coast Times (Apr. 17, 2020); Richard Winton, *Coronavirus Outbreak at Lompoc Prison is the Worst in the Nation: 69 Inmates, 25 Staff Infected*, L.A. Times (Apr. 16, 2020); Cassidy McDonald, *She Was Promoted A Month Before Her Death. Coworkers Say She Was Never Moved Into Her New Role, Away from Sick Inmates*, CBS News (Apr. 20, 2020).

States as a whole.[6]  Even still, the BOP's "figures do not accurately reflect" the scope of the crisis and the "problems associated with deadly virus spread in prison."  Walter Pavlo, *Federal Judges Are Relying on Bureau of Prisons COVID-19 Numbers To Make Rulings*, Forbes (May 20, 2020); Walter Palvo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020).

The COVID-19 outbreak at FCI Loretto first became public approximately two weeks ago.  *See* WJAC Staff, *DOH: Outbreak at FCI Loretto Contributes to Surge in Cambira County's COVID-19 Cases*, wjactv.com (Aug. 6, 2020).  While the BOP then reported "40 inmate and seven staff cases at FCI Loretto," local health officials stated that "the exact number" of cases was not clear.  *Id*.; *see also* WJAC Staff, *Officials Confirm Over 2 Dozen FCI Loretto Inmates Positive for COVID-19, & Some Staff*, wjactv.com (Aug. 11, 2020).  As of August 19, the BOP reported that 12 "Confirmed Active Cases" of inmates and 7 "Confirmed Active Cases" of staff, and claimed that 48 inmates and one staff member had "recovered."  BOP COVID-19 Page.  At least 60 inmates have tested positive.  *Id*.

## APPLICABLE LEGAL PRINCIPLES

In the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons.  Prior to this amendment, the BOP was the sole entity allowed to file such a request.  Now, a defendant may file such a motion either (1) after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," *or* (2) after "the lapse of 30 days from the receipt of such a

---

[6] See table available at https://federaldefendersny.org/.

request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act §

603(b).

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of

imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they

are applicable, if it finds that—"

> (i)      extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by
> the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the

First Step Act and has not been amended to account for the statutory changes to § 3582.

Accordingly, courts have held that "the most sensible interpretation of the Sentencing

Commission's guidance in light of Congress's recent statutory amendments is that 'the

Commission's existing policy statement provides helpful guidance on the factors that support

compassionate release, although it is not ultimately conclusive.'"  *United States v. Bucci*, 409 F.

Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me.

July 11, 2019)); *see also United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019*)*

("While the old policy statement provides helpful guidance, it does not constrain the Court's

independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence

reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction

may be warranted if "the court determines that—"

> (1)      (A)  Extraordinary and compelling reasons warrant the reduction; or

(B)  The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)     The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)     The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

The application notes contain four provisions that delineate extraordinary and compelling reasons, including medical conditions, age, family circumstances, and a catchall "other reasons" provision. *See* U.S.S.G. § 1B.13 appl. n. 1(A)–(D).  The notes further recognize that, "[t]he court is in a unique position to determine whether . . . circumstances warrant a reduction." *Id.* appl. n. 4.  Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances." *Beck*, 425 F. Supp. 3d at 582.

The First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate." *Id.* at 579.  Indeed, by permitting defendants to file sentence reduction motions directly with the sentencing court, regardless of whether the BOP has weighed in, the First Step Act reflects Congress's aim to diminish the BOP's control over compassionate release. *See Cantu*, 423 F. Supp. 3d at 351 (explaining that "defendants no longer need the blessing of the BOP to bring such motions").

This Court may determine whether a defendant's conditions are extraordinary and compelling independent of the reasons provided by the Sentencing Commission or the BOP. Courts have concluded that, after passage of the First Step Act, compassionate release is not limited by the Commission's or the BOP's understanding of "extraordinary and compelling reasons," and that courts can thus determine those reasons. *See United States v. Urkevich*, 2019

WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Bellamy*, 2019 WL 3340699, at *2

n.5 (D. Minn. July 25, 2019) (citing lower court decisions); *Beck*, 425 F. Supp. 3d at 579 (noting

the First Step Act "was enacted to further increase the use of compassionate release and . . .

explicitly allows courts to grant such motions even when BOP finds they are not appropriate");

*Cantu*, 423 F. Supp. 3d at 349–52.

## ARGUMENT

## I.     THIS COURT MAY AND SHOULD CONSIDER THIS MOTION NOTWITHSTANDING THE PENDING APPEAL.

Mr. Fogle's filing of a notice of appeal of the Court's order denying his request for relief

under § 404(b) of the First Step Act was "an event of jurisdictional significance—it confer[ed]

jurisdiction on the court of appeals ad divest[ed] the district court of its control over those

aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459

U.S. 56, 58 (1982).  However, Federal Rule of Criminal Procedure 37 allows a district court to

consider a motion notwithstanding a docketed and pending appeal and either "(1) defer

considering the motion; (2) deny the motion; or (3) state that it would grant the motion if the

court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R.

Crim. P. 37(a).  Because the pending appeal concerns a request for similar relief from Mr.

Fogle's sentence, this Court's ruling on compassionate release may obviate the need for briefing

in the pending appeal.  *See, e.g.*, Mot. for Voluntary Dismissal of Appeal, *United States v.

Hammond*, No. 19-3006 (D.C. Cir. June 4, 2020); Mem. Op. & Indicative Ruling, *United States

v. Hammond*, No. 02-cr-294 (BAH), 2020 WL 1891980 (D.D.C. Apr. 16, 2020); Appellant's

Unopposed Mot. to Remand Case, *United States v. Anderson*, No. 19-3087 (D.C. Cir. July 17,

2020); Orders, *United States v. Anderson*, No. 94-cr-055 (RCL), ECF Nos. 270, 272 (D.D.C.

July 17 & 20, 2020).

Therefore, Mr. Fogle requests that this Court state that it would grant Mr. Fogle's motion for compassionate release, Fed. R. Crim. P. 37, so that Mr. Fogle may request that the D.C. Circuit remand the case for that purpose, Fed. R. App. P. 12.1.

## II.     MR. FOGLE SATISFIED THE PROCEDURAL REQUIREMENT IN SECTION 3582(c)(1)(A)(i).

Mr. Fogle submitted a request for compassionate release/reduction in sentence to the warden of his BOP facility on or before June 11, 2020, and the warden denied his request on June 24, 2020.  Ex. C, Warden Resp. to Request for Compassionate Release (June 24, 2020). Section 3582(c)(1)(A) allows a defendant to file a compassionate release motion with the court after "the lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility."  Thirty days have passed since Mr. Fogle's request was received by the warden of his facility.  Therefore, Mr. Fogle satisfied the procedural requirement in the compassionate release statute and may request relief with the Court.

## III.    EXTRAORDINARY AND COMPELLING REASONS WARRANT A SENTENCE REDUCTION IN THIS CASE.

In the context of the unprecedented COVID-19 pandemic, Mr. Fogle's chronic comorbidities put him at increased risk of severe illness or death and substantially diminish his ability to care for himself in prison.  In addition, Mr. Fogle's sentence is "decades longer than sentences imposed on average for offenses at least as, if not more, serious than his offenses" due to "extraordinary and compelling [legal] developments that constitute extraordinary and compelling reasons that warrant a reduction to Mr. [Fogle]'s sentence of incarceration."  *United States v. Redd*, __ F. Supp. 3d __, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020).

**A.   Mr. Fogle's Chronic Medical Conditions Heighten His Risk of Serious Complications or Death from COVID-19 and Substantially Diminish His Ability to Provide Self-Care in Prison in This Pandemic.**

Mr. Fogle's health is declining and his chronic medical conditions—including type 2 diabetes mellitus, hypertension, hyperlipidemia, and obesity—make him particularly vulnerable to Covid-19, put him in grave danger of severe illness or death in a prison environment during this pandemic, and constitute extraordinary and compelling reasons to grant him compassionate release.

In light of the unprecedented crisis in our prisons, courts all over the country and in this district have recognized that a serious medical condition, such as diabetes, obesity, or hypertension, substantially diminishes an inmate's "ability 'to provide self-care within the environment of a correctional facility' for purposes of the Sentencing Commission's policy statement, U.S.S.G. § 1B1.13 cmt. n.1(A)(ii) (2018), such that it provides an extraordinary and compelling reason that warrants . . . compassionate release." *See, e.g.*, *United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 WL 2515856, at *10 (D.D.C. May 16, 2020) (citing *United States v. Lacy*, No. 15-cr-30038, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) (granting compassionate release to defendant with hypertension, obesity, and diabetes, on the grounds that "[a]ny one of these three factors alone would increase the serious risks of COVID-19")).

The government has taken the position that "if an inmate presents **one** of the factors identified by the Centers for Disease Control (CDC) that poses an increased risk of severe illness from COVID-19, they **should** be considered to be suffering from a 'serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover'—even if that condition in ordinary times would not meet the terms of the U.S.S.G. policy

statement."  Gov't Resp. at 10, *United States v. Gardner*, No. 09-cr-619, ECF No. 70 (D. Md.

May 27, 2020) (emphasis added) (citing U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I)); *see also, e.g.,*

*Wise v. United States*, No. CR ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020)

("[J]ust last week, the Department of Justice adopted the position that any inmate who suffers

from the chronic conditions associated with severe illness from COVID-19 are eligible for

compassionate release."); *United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at

*3 (D. Md. May 21, 2020) ("The Government now agrees, based on recent Department of Justice

guidance, that Wright's diabetes condition, and perhaps other medical conditions she presently

has, could constitute 'extraordinary and compelling reasons' under the circumstances of the

COVID-19 pandemic."); Gov't Resp., *United States v. Hird*, No. 2:13-cr-39-TJS, ECF No. 650

(E.D. Pa. May 19, 2020) (conceding that "the risk of COVID-19" to a vulnerable inmate

"presents a serious physical or medical condition . . . that substantially diminishes the ability of

the defendant to provide self-care within the environment of a correctional facility").[7]  Given the

government's prior concessions, there should be no dispute that Mr. Fogle presents extraordinary

and compelling reasons that warrant his compassionate release.

---

[7]  The government has made the same concession in cases involving defendants younger and
healthier than Mr. Fogle, and at prisons with no BOP-reported cases.  *See, e.g.*, Gov't Resp.,
*United States v. Firebaugh*, No. 16-cr-20341, ECF No. 49 at 2-3 (S.D. Fla. June 5, 2020) ("The
Government concedes that by having COPD and diabetes (CDC risk factors), Firebaugh has
established the requisite 'medical condition' under USSG § 1B1.13, cmt. n.1(A)," even though
"there are no known infections of staff or inmates at [FCI Petersburg]."); *United States v. Pabon*,
2020 WL 2112265, at *3-4 (E.D. Pa. May 4, 2020) ("[T]he government concedes that Mr.
Pabon's serious medical conditions [including diabetes and hypertension, among others] qualify
as one of the enumerated 'extraordinary and compelling reasons' under the policy statement
[USSG § 1B1.13, cmt. n.1(A)]," even though "the government represents that Lewisburg Camp
has no cases of COVID-19[.]").

**Type 2 Diabetes Mellitus**.  Mr. Fogle suffers from Type 2 diabetes.  *See* Sealed Ex. A, BOP Medical Records, at 1.  There is no question that "[p]eople of any age with" type 2 diabetes mellitus "**are at increased risk** of severe illness" and death from COVID-19.  CDC, *People with Certain Medical Conditions* (Aug. 14, 2020) (accessed Aug. 20, 2020) (emphasis in original). Diabetes is recognized as "one of the most important comorbidities linked to the severity of all three known human pathogenic coronavirus infections."  Stefan R. Bornstein et al., *Practical Recommendations for the Management of Diabetes in Patients with COVID-19*, 8 Lancet: Diabetes & Endocrinology 546, 546-47 (2020) (describing interplay of diabetes and Covid-19). A person with diabetes alone, and no other underlying condition, is at least three times more likely to require hospitalization from Covid-19 than someone without diabetes, and "racial and ethnic minority groups with [diabetes] . . . are even higher risk for severe COVID-19 illness." Ex. D-1, CDC Flyer, *Covid-19 Associated Hospitalization Related to Underlying Medical Conditions* (Aug. 8, 2020).  "Diabetes and high glucose levels are associated with increased complications, respiratory failure and mortality in hospitalized patients with COVID-19." American Association of Clinical Endocrinologists, *AACE Position Statement: Coronavirus (COVID-19) and People with Diabetes* (Updated March 18, 2020), https://perma.cc/P6D4-EQQK.

Mr. Fogle's diabetes substantially increases his risk of severe illness and death from Covid-19 and thus constitutes an extraordinary and compelling reason for his immediate release. *See United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding extraordinary and compelling reasons where inmate had "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19"); *United States v. Rodriguez*, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (discussing how CDC

statistics relating to diabetes, "which focus on the non-prison population . . . become even more concerning when considered in the prison context," because "[p]risons are tinderboxes for infectious disease" and granting compassionate release because "it is the confluence of COVID-19 and [diabetes and hypertension] that makes this circumstance extraordinary and compelling").

**Hypertension (High Blood Pressure)**.  "[I]t is undisputed that 'hypertension is one of the most common 'comorbidities' in people who experience severe cases of COVID-19.'" *United States v. Robinson*, 2020 WL 4041436, at *5 (E.D. Va. July 17, 2020) (quoting *United States v. Salvagno*, 2020 WL 3410601, at *12 (N.D.N.Y. June 22, 2020)).  The CDC's data has consistently indicated that hypertension is the leading health condition for those hospitalized with Covid-19—as of August 1, 2020, 53.8 percent of hospitalizations had a medical diagnosis of hypertension.  *A weekly Summary of U.S. Covid-19 Hospitalization Data*, Covid-Net (last updated Aug. 1, 2020), https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last visited Aug. 7, 2020).  Hypertension is also directly tied to an increase in mortality rate.  *See* Erik Greb, *COVID-19: Hypertension Tied to Twofold Increase in Mortality*, www.medscape.com/viewarticle/932377 (June 15, 2020).

Similar to diabetes, the CDC warns that a person with hypertension alone, and no other underlying condition, is at least three times more likely to require hospitalization from Covid-19 than someone without hypertension, and "racial and ethnic minority groups with [hypertension] . . . are even higher risk for severe COVID-19 illness."  Ex. D-1, CDC Flyer, *Covid-19 Associated Hospitalization Related to Underlying Medical Conditions* (Aug. 8, 2020).  "[S]everal peer-reviewed scientific studies and research commentaries in reputable scientific journals conclude that hypertension is independently associated with severe manifestations of COVID-19, controlling for the confounding variables of age and other health conditions."  *Robinson*, 2020

16

WL 4041436, at *5 (citing numerous studies). "The scientific authorities, recognizing the high comorbidity relationship between hypertension and COVID-19, . . . 'indicate an association between 'hypertension' broadly, and severe illness and death from COVID-19'" regardless of "the severity of the defendant's hypertension." *Id*. (citing *Salvagno*, 2020 WL 3410601, at *16).[8] Mr. Fogle's hypertension "creates an increased risk that he will contract the virus and experience severe illness as a result" and thus constitutes an extraordinary and compelling reason for his immediate release. *Id*.

Recognizing the serious life-threatening risks that hypertension presents to prisoners during this pandemic, many courts have granted compassionate release based on hypertension alone. *See, e.g.*, *id.* (granting compassionate release to career offender); *United States v. Mason,* 2020 WL 4199553 (D.D.C. July 10, 2020) (granting compassionate release "a 50-year-old African-American male with hypertension" who served 28 months of a mandatory 60-month sentence for conspiracy to distribute heroin, fentanyl, and alprazolam); *Salvagno*, 2020 WL 3410601; *United States v. Pena*, No. 15-CR-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Soto*, No. 1:18-CR-10086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at * 9 (S.D.N.Y. Apr. 20, 2020) (finding hypertension to be a comorbidity that increases the risk of death from COVID-19, and "reject[ing] the Government's contention that

---

[8]  Mr. Fogle's hypertension requires prescription medication; and even with medication compliance, Mr. Fogle's hypertension is so high that it borders Stage 2. *Compare* Sealed Ex. A at 1 (noting blood pressure reading of 139/89 on Feb. 13, 2020), *with* American Heart Association, *Understanding Blood Pressure Readings*, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (noting systolic number of 140 or higher and diastolic number of 90 or higher constitutes Stage 2 hypertension).

Mr. Scparta's general good health before the pandemic speaks to whether he should now be released"); *United States v. Sawicz*, No. 08 CR-287 (ARR), 2020 WL 1815851 (E.D.N.Y, Apr. 10, 2020) (granting compassionate release to a defendant convicted of possession of child pornography suffering from hypertension).

**Hyperlipidemia (High Cholesterol).**  Mr. Fogle also suffers from hyperlipidemia. Hyperlipidemia, also known as high cholesterol, is a term that covers several disorders causing extra lipids (fats) in one's blood.  *See* WebMD, *What Is Hyperlipidemia?* (July 19, 2020), https://www.webmd.com/cholesterol-management/hyperlipidemia-overview.  As a condition that causes lipid build-up in the blood, hyperlipidemia causes symptoms and carries serious risks of cardiovascular problems.  *Id.*  By advising people to "make sure that you have at least a 30-day supply of your heart disease medicines, including high cholesterol and high blood pressure medicines," the CDC indicates that high cholesterol constitutes a type of "heart disease."  CDC, *People with Certain Medical Conditions* (accessed July 30, 2020), www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  The CDC warns that such heart conditions place individuals of any age at an increased risk of severe illness from COVID-19.  *Id.*; *see also* Ex. B, JAMA Article at E5 ("Complications of COVID-19 include impaired function of the heart, brain, lung, liver, kidney, and coagulation system.").

High cholesterol, by itself, has been tied to many deaths and severe cases of COVID-19. Cholesterol promotes viral entry of the virus, *see* Liji Thomas, *Does cholesterol play a role in COVID-19?*, www.news-medical.net (May 12, 2020), and high cholesterol levels in lung tissue may be a key culprit in COVID-19 deaths, *see* David Templeton, *Cholesterol could be the*

*culprit in COVID-19 deaths*, Pittsburgh Post-Gazette (June 7, 2020).  Mr. Fogle's hyperlipidemia

thus adds to the extraordinary and compelling reasons for his release.

**Obesity**.  Mr. Fogle is clinically obese.  BOP medical records note that, on February 13,

2020, he weighed 229 pounds.  Sealed Ex. A at 1.  The PSR records his height as "6 feet tall."

PSR ¶ 58.  Consequently, Mr. Fogle's Body Mass Index ("BMI") is at least 31.1.  To provide

perspective:  at the time of sentencing, at age 33, Mr. Fogle weighed 165 pounds.  PSR ¶ 58.  At

165 pounds, considering a height of 6 feet, his BMI was 22.4, and fell right in the middle of the

"normal" range of 18.5 to 24.9.  He has since gained approximately 64 pounds, almost 40% of

his bodyweight at sentencing.[9]

The CDC lists obesity, defined as BMI of 30 or higher, as a specific condition that

increases a person's risk of severe COVID-19 illness.  CDC, *CDC updates, expands list of*

*people at risk of severe COVID-19 illness*, https://www.cdc.gov/media/releases/2020/p0625-

update-expands-covid-19.html (June 25, 2020).  And the government has conceded that a BMI

"above 30 constitutes an extraordinary and compelling reason warranting a reduction [sic]

sentence."  Gov't Ltr., *United States v. Cole*, No. 18-cr-167 (ELH), ECF No. 95 (D. Md. July 30,

2020).  As with both diabetes and hypertension, the CDC warns that a person with obesity alone,

and no other underlying condition, is at least three times more likely to require hospitalization

from Covid-19 than someone without obesity, and "racial and ethnic minority groups with

---

[9]  BMI calculated using National Institutes of Health ("NIH"), National Heart, Lung, and Blood
Institute, Calculate Your Body Mass Index,
https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.  The BOP records that
counsel received do not record Mr. Fogle's height.  However, some dated criminal records
record Mr. Fogle as only 5'8".  The PSR may overstate Mr. Fogle's height and, if so, his obesity
is even more severe.  At a height of 5'8", his BMI would be close to 35 (34.8).

[hypertension] . . . are even higher risk for severe COVID-19 illness."  Ex. D-1, CDC Flyer, *Covid-19 Associated Hospitalization Related to Underlying Medical Conditions* (Aug. 8, 2020).

Researchers explain that "[o]besity can restrict ventilation by impeding diaphragm excursion, impairs immune responses to viral infection, is pro-inflammatory, and induces diabetes and oxidant stress to adversely affect cardiovascular function."  David A. Kass et al. *Obesity could shift severe COVID-19 disease to younger ages*, 395 Lancet 1544, 1544 (May 16, 2020).  Researchers further explain that, during the H1N1 influenza epidemic, "reports from around the world identified obesity and severe obesity as risk factors for hospitalization and mechanical ventilation."  William Dietz & Carlos Santos-Burgoa, *Obesity and its Implications for COVID-19 Mortality*, 28:6 Obesity 1005, 1005 (June 2020) (describing "the impact of obesity on pulmonary function").

The likelihood of complications from COVID-19, such as hospital admission or intubation, increases incrementally as BMI increases.  Christopher M. Petrilli, et al., *Factors associated with hospital admission and critical illness among 5279 people with coronavirus disease 2019 in New York City: prospective cohort study*, 369 BMJ 1966 (May 2020) (any increase in BMI is associated with hospital admission); Arthur Simonnet et al., *High prevalence of obesity in Severe Acute Respiratory Syndrome Coronavirus -2 (SARS-CoV-2) requiring invasive mechanical ventilation*, 28 Obesity 7 (April 2020) (The need for invasive mechanical ventilation gradually increases with body mass, reaching nearly 90% in patients with BMI over 35).  A study in China found that, of 112 Covid-19 patients studied, 88 percent of those who died had BMI over 25.  Of those who survived, only 19 percent had BMI over 25.  Peng YD et al., *Clinical characteristics and outcomes of 112 cardiovascular disease patients infected by 2019-nCoV*, PubMed.gov (Mar. 2020), https://pubmed.ncbi.nlm.nih.gov/32120458/.

Accordingly, researchers "emphasize the need for increased vigilance, priority on detection and testing, and aggressive therapy for patients with obesity and COVID-19 infections."  Dietz & Santos Burgoa, *supra.*  Doctors "recommend extra attention and precautions for patients with obesity during this epidemic."  Radwan Kassir, *Risk of COVID-19 for patients with obesity*, 21:6 Obesity Reviews 1, 1 (Mar. 2020).  Doctors advise, "you need to treat obesity seriously as a pre-existing condition that increases your risks for COVID-19. . . . [I]f you're obese and you're 25, or 35, or 45 [years old], you have a risk factor and you should be appropriately careful."  Katie Pearce, *Obesity a Major Risk Factor for COVID-19 Hospitalization* (June 1, 2020), https://hub.jhu.edu/2020/06/01/david-kass-obesity-covid-19/ (quoting David Kass, Cardiologist, Johns Hopkins Hospital).

Courts in this district have recognized "the multitude of studies linking obesity to severe COVID-19 symptoms."  Mem. Op. & Order at 12, *United States v. Warren*, 10-cr-202-EGS, ECF No. 66 (D.D.C July 30, 2020) ("*Warren* Order") (granting compassionate release to defendant with BMI under 30 (29.78 to 29.94)).  And some courts have granted compassionate release based on obesity alone.  *See, e.g., United States v. Mitchell,* 2020 WL 4284311 (E.D. Mich. July 27, 2020) (granting compassionate release to inmate with BMI of 31-32); *United States v. Williams*, 2020 WL 3073320, at *4 (D. Md. June 10, 2020) (granting compassionate release to at-risk obese inmate with a "BMI of 32.5").

**Age.**  Mr. Fogle is almost 49 years old, and correctional experts consider an inmate to be "geriatric" at age 50.  Brie A. Williams et al., *The Older Prisoner and Complex Chronic Medical Care* 165-70, WHO, Prisons and Health (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf; *see also* Office of the Inspector General, Dep't of Justice, *The Impact of an Aging Inmate Population on*

21

*the Federal Bureau of Prisons* at i-ii, 10, 16-17, 23-24, 30-31. (May 2015, rev'd Feb. 2016),

https://oig.justice.gov/reports/2015/e1505.pdf ("Aging Inmate Report") (finding that aging

inmates—defined as age 50 and older—are costly to incarcerate, BOP institutions lacked the

staff and appropriate training to address their needs, the physical infrastructure of BOP

institutions could not adequately house them, and the BOP failed to provide programming

opportunities addressing their needs).  Similarly, the government has recognized that "an

inmate's physiological age averages 10–15 years older than his or her chronological age due to

the combination of stresses associated with incarceration and the conditions that he or she may

have been exposed to prior to incarceration."  *Id*. at 1-2; *see also* Brie A. Williams et al., *Aging*

*in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J.

Public Health 1475-81 (2012); Brie Williams et al., *Detained and Distressed: Persistent*

*Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55

(2016).  Mr. Fogle has been incarcerated now for over 16 years, and he has thus aged

considerably more than an average person—as evidenced by his significantly failing health.

Thus, Mr. Fogle's physiological age is likely akin to someone between 58 and 63 years old.

"Age is an independent risk factor for severe illness" from COVID-19 and risk increases

steadily with age.  CDC, *CDC updates, expands list of people at risk of severe COVID-19 illness*,

https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html (June 25, 2020)

("June 25 CDC Update); *see also* CDC, *People Who Need Extra Precautions: Older Adults*,

https://perma.cc/A5Z9-FPRV.  Based on his age alone, Mr. Fogle is three to four times more

likely to require hospitalization from Covid-19, and 10 to 30 times more likely to die from

Covid-19, than someone age 18 to 29.  Ex. D-2, CDC Flyer, *COVID-19 Hospitalization and*

*Death by Age* (Aug. 10, 2020).

**Race.**  The virus disproportionately affects African Americans.  Erin K. Stokes et al., *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020*, CDC, 69 Morbidity and Mortality Weekly Report 759, 763 (June 15, 2020); Ex. B, JAMA Article at E8-E9.  Data collected by the CDC shows that hospitalization and death rates of African American individuals are "5 times that of non-Hispanic white persons."  CDC, *COVID-19 in Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (June 12, 2020); *see also* Ex. D-3, CDC Flyer, *COVID-19 Cases, Hospitalization, and Death by Race/Ethnicity (*Aug. 8, 2020) (providing that, compared to White persons, Black persons are 2.6 times more likely to contract the virus, 4.7 times more likely to require hospitalization for it, and 2.1 times more likely to die from it).

The CDC specifically lists racial and ethnic minority groups as "people who need extra precautions" during this pandemic.  CDC, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (June 25, 2020) ("Long-standing systemic health and social inequities have put some members of racial and ethnic minority groups at increased risk of getting COVID-19 or experiencing severe illness, regardless of age.") (emphasis omitted).  The CDC recognizes that racial and ethnic minority groups are over-represented in jails, prisons, and detention centers, which have specific risks due to congregate living, shared food service, and more, and also notes that "[s]tigma and systemic inequalities may undermine prevention efforts, increase levels of chronic and toxic stress, and ultimately sustain health and health care disparities."  CDC, *COVID-19 in Racial and Ethnic Minority Groups,* https://perma.cc/NA9B-NN4H.

Moreover, "[d]ata has shown that racial and ethnic minority groups with," *inter alia*, hypertension, obesity, or diabetes, "are at even higher risk for severe COVID-19 illness."  Ex. D-

1, CDC Flyer, *Covid-19 Associated Hospitalization Related to Underlying Medical Conditions* (Aug. 8, 2020).

Mr. Fogle's age and race combined also significantly increase his risk of severe illness. Black people age 18 to 49, are 6 times more likely to require hospitalization than White people in the same age group; and Black people age 50 to 64, are 5.5 times more likely to require hospitalization than White people in the same age group.  CDC, COVIDView, *Key Updates for Week 32, ending August 8, 2020*, at 11 (Aug. 13, 2020).

**Multiple Comorbidities Combined.**  Research shows that having any underlying medical condition puts an individual at increased risk of severe illness or death from COVID-19, and Mr. Fogle has multiple, co-occurring medical conditions.  According to the CDC, individuals with any reported underlying health condition "were hospitalized six times as often as otherwise healthy individuals infected with the novel coronavirus" and "they died 12 times as often."  Lena H. Sun, *Patients with underlying conditions were 12 times as likely to die of covid-19 as otherwise healthy people, CDC finds*, Wash. Post (June 15, 2020); *see also* Erin K. Stokes et al., *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020*, CDC, 69 Morbidity and Mortality Weekly Report 759, 762-63 (June 15, 2020) (showing, on Tables 2 and 3, that "underlying health conditions" "classified as 'known'" by the CDC include "other underlying medical condition[s] not otherwise specified" and finding that "[h]ospitalizations were six times higher and deaths 12 times higher among those with reported underlying conditions compared with those with none reported").  "Although only approximately 25% of of infected patients have comorbidities, 60% to 90% of hospitalized infected patients have comorbidities" and "[t]he most common comorbidities in hospitalized patients" are

"hypertension (present in 48%-57% of patients)" and "diabetes (17%-34%)"—both of which Mr.

Fogle has.  Ex. B, JAMA Article at E5.

     As detailed above, Mr. Fogle suffers from multiple medical conditions "identified by the

CDC [and other health authorities] as exacerbating the risk of serious harm if the individual

contracts COVID-19," including diabetes, hypertension (high blood pressure), and obesity.

*United States v. Mills*, 2020 WL 4431425, at *5 (E.D. Mich. July 31, 2020) (granting

compassionate release to defendant with asthma, hypertension, and obesity at facility with few

reported active cases).  Indeed, the CDC recognizes and warns that individuals with both

diabetes and obesity are at least 4.5 times more likely to require hospitalization from Covid-19,

and "racial and ethnic minority groups with" those "conditions are at even higher risk for severe

COVID-19 illness."  Ex. X1, CDC Flyer, *Covid-19 Associated Hospitalization Related to

Underlying Medical Conditions* (Aug. 8, 2020).

     Even if Mr. Fogle's "conditions independently d[id] not fit in the CDC's definition of

severity, which is not the case here, 'his conditions still exacerbate each other, placing him in a

much more vulnerable position than a healthy person if he were to get COVID-19.'"  *Mills*, 2020

WL 4431425, at *5 (quoting *United States v. Gardner*, 2020 WL 4200979, at *6 (E.D. Mich.

July 22, 2020)); *see also United States v. Clark*, 2020 WL 3395540, at *5-6 (S.D. Iowa June 17,

2020) (granting compassionate release to defendant with high blood pressure and moderate-to-

severe asthma at facility with no "confirmed, open case[]" because "Defendant's preexisting

medical conditions create an untenable risk of death should Defendant contract a lethal, easily

spread virus for which there is no known cure, no effective treatment, and no vaccine" (quotation

marks and citation omitted)); *United States v. Bradley*, 2020 WL 3802794, at *5 (E.D. Cal. July

7, 2020) (holding "that it is not any one of these conditions alone that creates a greater risk of his

suffering severe illness from COVID-19; instead, it is the 'particular danger' he faces given his combined conditions of diabetes, hypertension and asthma"); *Warren* Order at 11 (holding that defendant's borderline obesity, hypertension, and history of smoking "compound his risk" of COVID-19 and constitute "extraordinary and compelling reasons" for compassionate release).

Mr. Fogle cannot treat or control his diabetes, hypertension, hyperlipidemia, or obesity in prison—because he cannot maintain the appropriate diet. Foods to avoid include products with saturated fats, trans fat, cholesterol, and sodium. *See* Mayo Clinic, *Diabetes diet: Create your healthy-eating plan*, https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes-diet/art-20044295 (Feb. 19, 2019). The meals that Mr. Fogle must eat in prison are full of carbohydrates and processed foods, which Mr. Fogle should be avoiding. *See* BOP, Federal Bureau of Prisons – National Menu FY 2020, https://www.bop.gov/foia/docs/fy_2020_national_menus.pdf; *see also* Alysia Santo and Lisa Iaboni, *What's in a Prison Meal, The Marshall Project*, https://www.themarshallproject.org/2015/07/07/what-s-in-a-prison-meal (July 7, 2015). In addition, Mr. Fogle's ability to exercise and lose weight is limited by his custodial conditions, particularly in light of "lockdown" policies during the ongoing COVID pandemic.

In sum, Mr. Fogle's multiple, co-occurring conditions, his age, and his race significantly heighten his risks of contracting COVID-19, becoming severely ill from it, and suffering long-term health consequences from it, and establish extraordinary and compelling circumstances for his immediate release.

**Covid-19 Crisis at FCI Loretto.** Covid-19 is in "community spread" at FCI Loretto. As of August 19, the BOP reported 12 "Confirmed Active Cases" of inmates and 7 "Confirmed

Active Cases" of staff at FCI Loretto, and claimed that 48 inmates and one staff member had "recovered." BOP COVID-19 Page. At least 60 inmates have tested positive. *Id*.[10]

The basis for the BOP's "recovered" determination is unclear and problematic. Notably, "seemingly recovered patients" can "retest[] positive," and "at least a proportion of recovered patients still may be virus carriers." Stephanie Pappas, *Can People Spread Coronavirus After They Recover?*, Live Science (Feb. 29, 2020), https://perma.cc/5AF6-4YJE (quoting researchers based in China whose study about reinfection was published in the Journal of the American Medical Association); *see also* Maria Guerrero, *Seagoville Federal Prison COVID-Cases Fall Drastically, Expert Warns Against New Data as Family Mourns Loss*, www.nbcdfw.com (Aug. 14, 2020) (noting that former chief medical officer of New York City's jail system, who is also an epidemiologist, cautions against the BOP's data on "recovered" inmates and staff: "When you kind of wave a wand over people and say they're recovered, my experience going into jails and prisons is many of them are not actually recovered," he said. "Many of them have new shortness of breath, chest pain, ringing in the ears, headaches. Other very serious symptoms.").[11]

---

[10] The BOP website reports that nearly all inmates at FCI Loretto were tested (849 inmates), and that 60 inmates had positive test results. BOP Covid Page (Aug. 19, 2020). However, it does not appear that inmates were tested more than once, and it is unclear when and how the testing took place. "[F]alse-negative test results may occur in up to . . . 67% of patients." JAMA Article at E1. "Factors contributing to false-negative test results include the adequacy of the specimen collection technique, time from exposure, and specimen source." *Id*. at E6.

[11] In fact, an inmate at FCI Terminal Island, who tested positive and was then "converted to a status of recovered" on May 10, 2020, subsequently died on May 24. BOP Press Release, *Inmate Death at the FCI Terminal Island*, bop.gov (May 27, 2020). Another inmate who was hospitalized with Covid-19, placed on a ventilator, almost died, and was then returned to FCI Elkton after two negative Covid-19 tests subsequently tested positive again. *See* Keegan Hamilton, *Update from FCI Elkton, the place in our @MarshallProj @VICENews story on COVID-19 in federal prisons*, Twitter, https://twitter.com/keegan_hamilton/status/1279102953966583808.

Consequently, supposedly "recovered" inmates and employees likely nevertheless continue to infect others and spread Covid-19 at Loretto.

The "Confirmed Active Cases" of at least 7 staff members at Loretto are particularly troubling because "the BOP does not test employees."  Walter Pavlo, *As Bureau of Prisons Enters "Phase 9" Of COVID-19 Plan, BOP Staff Wonder If There Is A Real Plan*, Forbes.com (Aug. 7, 2020) (citing June 2020 Senate testimony from BOP medical director).  That means that staff members must be ill enough to, of their own accord, seek a COVID-19 test.  And, viral shedding of COVID-19 begins 2-3 days before the onset of symptoms.  Ex. B, JAMA Article at E3 (emphasis added); *id*. at E6 ("The average time from exposure to symptoms onset is 5 days, and up to 62% of transmission may occur prior to the onset of symptoms.") (emphasis added).  That means that staff members at Loretto almost certainly spread COVID-19 through the facilities, infecting other staff members and inmates, days before the onset of any symptoms, days before they called out sick from work, and days before they were able to access testing for COVID-19 outside of work.  Consequently, because there are numerous staff members with "Confirmed Active Cases" of COVID-19, there are almost certainly many more than 19 active COVID-19 cases of inmates and staff at FCI Loretto.

"Some BOP facilities have seen outbreaks grow into hundreds of confirmed cases in a matter of weeks."  *Clark*, 2020 WL 3395540, at *6 (quoting *United States v. Moore*, 2020 WL 2572529, at *2 (D. Or. May 21, 2020)) (granting release to defendant at facility with no confirmed, open cases, reasoning that several "staff members have contracted the virus, and the virus has spread at a nearby halfway house"); *see also Bradley*, 2020 WL 3802794, at *6 ("Regardless of the number of COVID-19 cases at any given time, 'infection can spread with a deadly speed.'" (citation omitted)).  Accordingly, "inmates with multiple health conditions can

demonstrate an 'extraordinary and compelling reason' warranting a reduction, even with no confirmed cases in the institution where they are housed." *Id.*

Loretto has "three multiple occupancy housing units" "made up of two man, four man and six man rooms," a disciplinary special housing unit ("SHU") with 24 cells, and one single dormitory style housing unit.  BOP, PREA Audit Report at 8-9 (Sept. 12, 2019), www.bop.gov/locations/institutions/lor/LOR_prea_2019.pdf.  The capacity of the facility is 784 inmates, *id.* at 3, and it exceeds capacity, with 850 total inmates, BOP, FCI Loretto, www.bop.gov/locations/institutions/lor/ (accessed Aug. 19, 2020).  Crowded situations," "close/physical contact," "enclosed space," and "duration of exposure" all "increase community spread and individual risk."  Ex. D.  It is impossible for Mr. Fogle to socially distance from other inmates, avoid communal areas and frequently touched surfaces, practice sufficient hygiene, and sanitize his environment sufficiently to protect himself from COVID-19 at Loretto.

**B.      Mr. Fogle's Sentence is Excessively Harsh, and If Sentenced Today for the Same Conduct, He Would Receive a Dramatically Lower Sentence.**

The catchall provision in the Guidelines policy statement, entitled "Other Reasons," encompasses "an extraordinary and compelling reason other than, or in combination with" a person's age, medical condition, or family circumstances.  U.S.S.G. § 1B1.13 appl. n. 1(D). While the provision contemplates that such other reasons be determined by the Director of the BOP, that "prefatory language . . . is, in substance, part and parcel of the eliminated requirement that that relief must be sought by the BOP Director in the first instance."  *Redd*, 2020 WL 1248493, at *7.  Because the language conflicts with the First Step Act's statutory amendments, it no longer applies.  *See id.* (citing, in part, 18 U.S.C. § 3553(a)(5) and noting that "any 'pertinent policy statement' is to be considered 'subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be

29

incorporated by the Sentencing Commission into the amendments issued under section 994(p) of title 28'"); *United States v. Cantu*, 423 F. Supp. 3d 345, 350–51 (S.D. Tex. 2019).

Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." *Beck*, 425 F. Supp. 3d at 583. Indeed, even before the First Step Act, the Commission recognized "that courts are in a 'unique' position to determine whether such circumstances are present." *Id*. at 583, 583 n.11; U.S.S.G. § 1B1.13 appl. n.4. Accordingly, "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.C. § 1B1.13 cmt. n. 1(A)-(C) . . . consisten[t] with any applicable policy statement." *Redd*, 2020 WL 1248493, at *8; *accord United States v. Decator*, 2020 WL 1676219 (D. Md. Apr. 6, 2020); *United States v. Millan*, 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020).

Many "courts have held, noted, and implied that a change in the law affecting the fairness of the sentence, like the one here, is relevant in determining whether extraordinary and compelling reasons exist." Order at 4-5, *United States v. Smith*, No. 14-cr-189 (TSC), ECF No. 76 (D.D.C. May 14, 2020) ("*Smith* Order") (citing cases and holding that the "change in law" to a career offender determination from *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018), "given its significant bearing on Smith's sentence, is itself an extraordinary and compelling reason to reduce his sentence"). "The fact that [Mr. Fogle], if sentenced today for the same conduct, would likely receive a dramatically lower sentence than the one he is currently

serving, constitutes an 'extraordinary and compelling' reason justifying" compassionate release. *Decator*, 2020 WL 1676219, at *3.

Mr. Fogle's sentence was based exclusively on the legal characterization of his prior convictions as "crimes of violence."  As explained in his *Johnson* pleadings, it is undisputed that, today, a D.C. attempted robbery conviction does not qualify as a "crime of violence" and Mr. Fogle would not be labeled a "career offender."  Without the career offender enhancement, Mr. Fogle's offense level (including a 2-level obstruction enhancement under § 3C1.1, identified in the PSR),[12] for 0.82 grams of crack cocaine would be 14.  With a Criminal History Category of IV,[13] his advisory Guidelines range would be 27 to 33 months of imprisonment.

Mr. Fogle's current 280-month sentence is substantially "out-of-step with sentences that would be imposed on similarly-situated defendants today."  *United States v. Curtis*, No. 03-cr-533-BAH, 2020 WL 1935543, at *5 (D.D.C. Apr. 22, 2020) (granting compassionate release to a defendant who served 17 years of life sentence for sex trafficking children based, in part, on the disparity between the sentence defendant received and what he would receive today); *see also Smith* Order at 3 (granting compassionate release "to make his sentence consistent with the D.C. Circuit's recent holding [in *Winstead*] that the applicable provision of the career offender guideline 'clearly excludes inchoate offenses'").  "There is no doubt that there is a gross disparity between the sentence Mr. [Fogle] received and the sentence he would have received [today]."  *Redd*, 2020 WL 1248493, at *6.  Therefore, a reduction in his sentence "is warranted

---

[12]  Because Mr. Fogle was deemed a career offender at his original sentencing and the career offender Guideline trumped the offense level calculations, it does not appear the Court ever ruled on the obstruction enhancement.

[13]  Mr. Fogle was originally in Category III absent the career offender enhancement.  However, his conviction and sentence in D.C. Superior Court case 2012 CF1 20391 would likely give him 3 additional criminal history points, resulting in 8 points and Category IV.

by extraordinary and compelling reasons, specifically, the injustice of facing a term of

incarceration [20] years longer" than is "now deem[ed] warranted for the crimes committed."

*United States v. Urkevich*, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019); *see also United

States v. Maumau*, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020); *Decator*, 2020 WL

1676219, at *3.

*     *     *

In sum, "[t]he combination of factors, age, health conditions, COVID-19 risk, as well as

length of time already served and the changing sentencing landscape justify granting

compassionate release to Mr. [Fogle]." *United States v. Martin*, 2020 WL 3447760, at *3 (D.

Md. June 24, 2020).

## IV.   MR. FOGLE IS NOT A DANGER TO THE COMMUNITY AND ADDITIONAL IMPRISONMENT IS GREATER THAN NECESSARY.

Reducing Mr. Fogle's sentence to permit his immediate release from imprisonment

would reflect the appropriate consideration of the sentencing factors today, in light of the current

pandemic and significant changes in the law.

The applicable Guidelines, the seriousness of the offense, and the need for the sentence to

provide just punishment support Mr. Fogle's immediate release.  As discussed above, Mr.

Fogle's applicable Guidelines range is 27 to 33 months.  However, he is currently serving 280

months for low-level, non-violent drug transactions that took place at his home in the span of 15

minutes.  No firearm or weapon of any kind was involved.

Mr. Fogle has been in custody for approximately 193 months and has earned

approximately 20 months of good time credit.  *See* Ex. E, BOP Sentencing Computations (last

updated on Apr. 13, 2020) (providing "TOTAL GCT EARNED . . . : 632 [days]").  Thus, by

counsel's calculations, he has served the equivalent of a 213-month sentence.  Accounting for the

32

separate, consecutive 120-month Superior Court sentence in 2012-CF1-20391, Mr. Fogle has served approximately 93 months of imprisonment in this case—more than triple the time he would face for the same crime today.  Even disregarding his 20 months of good time credit, Mr. Fogle has served approximately 72 months (6 years) on solely the instant offense, which is more than double the time he would face for the same crime today.  "That a defendant sentenced today, identical in every way to the defendant in this case, would face [no more than approximately three years'] imprisonment is strong evidence that" over six years' imprisonment is greater than necessary to reflect the seriousness of the offense and provide just punishment. *Cf. Curtis*, 2020 WL 1935543, at *5.  For the same reason, Mr. Fogle's continued incarceration perpetuates unwarranted sentencing disparities that a reduction in his sentence would mitigate.

In addition, Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016).  This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences."  Austin, Brennan Ctr., *supra*, at 35.

Mr. Fogle's criminal history is extremely dated and he is, in no way, a danger to the community.  The offense conduct in this case took place in 2003, approximately 18 years ago. All of his other convictions, including the conviction in 2012-CF1-20391, arose from offense conduct before April 1999—over 20 years ago.  And the BOP considers Mr. Fogle a "low security inmate," and has designated him to a low security correctional facility.

A sentence allowing for Mr. Fogle's immediate release would also account for "evidence of [Mr. Fogle's] rehabilitation since his prior sentencing."  *Pepper v. United States*, 562 U.S. 476, 488 (2011).  Mr. Fogle has worked steadily throughout his time in prison, including in the

kitchen and as a unit orderly.  He completed 125 hours GED Advanced Level; 408 hours Pre-GED; 60 hours GED Wait List Class; 40 hours GED; 2 hours Room 3 GED; and 2 hours VT Room 2 GED.  In addition, he has taken 24 hours of Unit Taught Faith Base; 20 hours each of Parenting Program, History of Science Fiction, Employment Resource Course, 4 Phase Re-Entry Program, Money Smart FDIC, Money Smart Financial Course, Life Coach, Employment Skills, and Getting It Right/Pre-Release; 8 hours of Learn the Basics Step Aerobics and Seven Step Program; and 1 hour each of Computer Learning Center Orientation, Health Fair, Health/Nutrition, Employment, Personal Finance, Community Resources, Release Requirement, and Personal Growth.[14]

The RAND Corporation has documented that "[i]nmates who participate in any kind of educational program behind bars—from remedial math to vocational autoshop to college-level courses—are up to 43 percent less likely to reoffend and return to prison[.]"  *The Case for Correctional Education in U.S. Prisons*, RAND Review (Jan. 3, 2016), *available at* https://www.rand.org/blog/rand-review/2016/01/course-correction-the-case-for-correctional-education.html.  Mr. Fogle completed his drug education in August 2010, submitted his DNA sample in June 2011, and satisfied his special assessment in August 2011.

Mr. Fogle's disciplinary history is minor.  To counsel's knowledge, his most recent incident was years ago, in August 2017, and it was for "destroy[ing] property $100 or less," which counsel understands was related to a spatula from the kitchen going missing.  The remainder of his disciplinary history was also minor, consisting only of Level 200 and 300 infractions, not any of the most serious infractions in prison, which are designated as Level 100

---

[14]  The Probation Office provided counsel with information about Mr. Fogle's prison record a little over a year ago, in June 2019.  Copies of several of his educational certificates are also attached.  *See* Ex. F, Certificates.

infractions.[15]  Rather, the most serious of his infractions is for "possessing a hazardous tool" (Feb. 2011), which counsel understands was a cell phone.[16]  His other infractions were for refusing or being absent from work assignments (Oct. 2015; Aug. 2015; Sep. 2015; July 2006; Oct. 2018; Nov. 2011); refusing to obey an order (June 2014; Nov. 2010); phone abuse (Aug. 2016; Aug. 2016); and possessing an unauthorized item (June 2014).

In spite of the long, disparate sentence he is serving, Mr. Fogle has taken advantage of the limited BOP programming opportunities available to him and focused on rehabilitating himself.  Upon release, Mr. Fogle hopes for the opportunity to train for and obtain a commercial driver's license, to find employment as soon as possible, and to spend as much time as possible with his family, especially his two daughters.  Mr. Fogle would also greatly appreciate the opportunity to participate in the Court's reentry court program if at all possible.  His family, including his mother and his two daughters, yearn to have him home and will support him as he transitions back into the community.

Finally, the need to provide Mr. Fogle with needed medical care in the most effective manner supports his compassionate release.  Mr. Fogle is an "aging inmate" and suffers from multiple medical conditions that make him particularly vulnerable to Covid-19, which is currently present at his prison.  Even under normal circumstances, the BOP has struggled to meet the needs of aging inmates.  BOP institutions have inadequate staffing capacity to provide timely medical care, accompany inmates on outside medical visits, assist with activities of daily living, and provide programming tailored to the elderly.  *See* Aging Inmate Report at 17; *see also* OIG,

---

[15]  Level 100 infractions include the following types of serious misconduct:  using or possessing drugs or alcohol, using or possessing a dangerous weapon, and assaulting another person resulting in serious injury.

[16]  The infraction also included refusing to obey an order.

Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016) (noting that almost 20 percent of the BOP's health services positions are vacant, contributing to long waiting periods for care).

In addition, in BOP custody, Mr. Fogle cannot maintain the diet of nutritious meals necessary to mitigate his chronic conditions and relieve his symptoms.   *See, e.g., Diabetes Diet: Create your healthy-eating plan*, The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes-diet/art-20044295; *The DASH Diet: Healthy eating to lower your blood pressure*, The Mayo Clinic, https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/in-depth/dash-diet/art-20048456.  Alarmingly, "the BOP does not have a quality assurance plan to ensure that food products procured by the BOP meet the specifications outlined in BOP contracts, the standards set forth in BOP's national menu, industry standards, and legal requirements," which "endanger[s] the health and well-being of both BOP inmates and staff."  OIG, *Management Advisory Memorandum of Concerns Identified with the Federal Bureau of Prisons' Procurement of Food Products* at 1 (reissued Jun. 2020), https://oig.justice.gov/sites/default/files/reports/i20029.pdf.  With the advent of Covid-19, the lockdown conditions at FCI Loretto, and Mr. Fogle's chronic health problems, the BOP is even less able to provide adequate care and nutrition for Mr. Fogle.

*     *     *

In sum, Mr. Fogle is currently serving a disparate 280-month sentence for selling less than one gram of crack, a sentence that was exponentially greater than any sentence he had before received.  He was sentenced a mere five months after *United States v. Booker*, 543 U.S. 220 (2005).  Under today's law, he would not be labeled a career offender and would benefit from significant retroactive amendments to the drug guidelines to mitigate racially disparate

sentences.  He has made great rehabilitative efforts in prison despite his long sentence and suffers from multiple chronic medical ailments that now, in the midst of the Covid-19 pandemic, threaten his life.  The § 3553(a) factors weigh overwhelmingly in favor of reducing his sentence to allow for his immediate release.

To effectuate compassionate release, the Court must reduce Mr. Fogle's sentence to time-served and specify that the sentence run <u>concurrent</u> to Superior Court Case No. 2012-CF1-20391, or reduce Mr. Fogle's sentence to a term of no more than 93 months to account for the consecutive sentence in Superior Court Case No. 2012-CF1-20391.  Unlike the binding Guidelines policy statements governing § 3582(c)(2) proceedings, nothing governing § 3582(c)(1)(A) proceedings precludes the Court from "reduc[ing] [a] term of imprisonment [to] less than the term of imprisonment the defendant has already served."  *Compare* U.S.S.G. § 1B1.10(b)(2)(A), *with* U.S.S.G. § 1B1.10(b)(2)(C).  *Cf. United States v. Nance*, 2019 WL 2436210, at *2 (D. Neb. June 10, 2019).

## CONCLUSION

For the foregoing reasons, Mr. Fogle respectfully requests that the Court issue an indicative ruling stating that it would grant Mr. Fogle's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) to allow for his immediate release from imprisonment by reducing his sentence to time-served <u>concurrent</u> to his sentence in D.C. Superior Court Case No. 2012-CF1-20391, or to a term of no more than 93 months, "if the court of appeals remands for that purpose." Fed. R. Crim. P. 37(a)(3).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

CELIA GOETZL
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500